UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

GARY CHAMBERS,

Petitioner,

v.

JEREMY BEAN, et al.,

Respondents.

Case No. 3:22-cv-00097-ART-CLB

**MERITS ORDER**

**[ECF No. 18]**

Petitioner Gary Chambers, a Nevada prisoner who was convicted by a jury of second-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, and battery with the use of a deadly weapon and who pleaded guilty to ownership or possession of a firearm by a prohibited person, has filed a counseled Second-Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, alleging that his trial counsel was ineffective, the trial court made erroneous rulings, the prosecution committed misconduct, and there were cumulative errors. (ECF No. 18 ("Second-Amended Petition").) Respondents answered the Second-Amended Petition, and Chambers replied. (ECF Nos. 54, 66.) For the reasons discussed below, this Court denies the Petition and a Certificate of Appealability.

I.    **BACKGROUND**

A.    **Factual background[1]**

Lance Berg testified that on July 9, 2013, he was working at Van's Trailer Park in Las Vegas, Nevada as a maintenance man. (ECF No. 27-33 at 12.) Around 10:00am that morning he heard arguing coming from the trailer in space number 45. (*Id.* at 13–14.) Berg decided to approach the trailer, but as he did, he heard three gunshots. (*Id.* at 16.) Berg saw a man walk out the front door of the trailer,

[1] This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the Second-Amended Petition.

walk to a gray SUV, which had handicap plates and a woman in the passenger seat, and drive off. (*Id.* at 16, 18–19.) Berg picked Chambers out of a photographic lineup as the person who left the trailer following the shooting. (*Id.* at 22.)

Charles Braham, who worked as an electrician for Van's Trailer Park in 2013, testified that Lisa Papoutsis and Gary Bly lived in Van's Trailer Park as roommates in space number 45. (ECF No. 27-33 at 63–66.) Braham was working on the morning of July 9, 2013, when he heard gunshots and screaming around 10:00am. (*Id.* at 69.) Braham and Brad Grieve, the manager of Van's Trailer Park, walked to space number 45 to see what was going on. (*Id.* at 70.) Braham heard Papoutsis yelling "[g]et the fuck out of here" before and after gunshots. (*Id.* at 81.) Braham stayed at the gate outside of the trailer in space number 45 and saw Chambers exit the trailer and walk to his silver vehicle. (*Id.* at 71–72, 74.) Braham saw "the front part of a gun in [Chambers's] hand." (*Id.* at 73.) Braham went back to his trailer and called 911. (*Id.* at 80.)

Grieve testified that on July 9, 2023, at around 10:00am, he was just getting back to the trailer park from a home improvement store when he heard Papoutsis yelling. (ECF No. 27-33 at 85, 88.) Grieve parked his truck near space number 45 and "started walking towards [Papoutsis's] trailer" when he "heard a bang and then a little bit later a bang, bang." (*Id.* at 88–89.) When Grieve was at the bottom of the steps to Papoutsis's trailer, "Chambers came out [the front door of the trailer] and he looked rattled and . . . surprised." (*Id.* at 90.) Grieve saw "a gun that was about three-quarters of the way out of [Chambers's] pocket and his hand . . . had ahold of the butt of the weapon." (*Id.* at 92.) Grieve went into the trailer and found Bly unconscious and Papoutsis, who "was still screaming and not too coherent," with a gunshot wound to her arm. (*Id.* at 94, 96.)

Papoutsis testified that on July 9, 2013, while she and Bly were eating breakfast, she received a phone call from Chambers, whom she called Money. (ECF No. 27-33 at 104, 108.) Chambers asked Papoutsis if he could stop by, and

Papoutsis indicated that he could. (*Id.* at 109.) Chambers arrived 15-20 minutes later, entered the trailer, and sat on the arm of the couch. (*Id.* at 109–111.) Chambers asked Papoutsis if she "knew what this was about," and Papoutsis responded that she did not. (*Id.* at 111.) Chambers said something to Papoutsis "that gave [her] the impression that he was going to rob" her. (*Id.* at 112.) Papoutsis called for Bly, who had been in the restroom. (*Id.* at 112–13.) Bly was "trying to . . . understand what was going on and confronted" Chambers, meaning Bly "had walked up to [Chambers] and asked him something . . . and was sort of almost face-to-face with him." (*Id.* at 113–14.) Chambers then shot Bly. (*Id.* at 114–15.) After Bly fell, Papoutsis grabbed her phone, and as Chambers "was reaching down to get his keys, the gun came up, and it looked like it was aimed towards [Papoutsis's midsection] and [she] smacked it down with [her] left hand." (*Id.* at 115–16.) This caused the gun to go off, and a bullet entered and then exited Papoutsis's hand. (*Id.* at 117.) Papoutsis ran "to the back door to call for a friend" as Chambers exited out the front door. (*Id.* at 117–18.) Papoutsis was transported by ambulance to the hospital where she received surgery on her hand. (*Id.* at 119.) Papoutsis testified that she and Bly did not have any weapons. (*Id.* at 115.) Chambers's wallet was later found in Papoutsis's trailer. (*See* ECF No. 27-38 at 21.) And a plastic baggie containing illegal drugs was found on Papoutsis's coffee table. (ECF No. 27-42 at 31.)

Cynthia Lacey, who appeared by audiovisual means at Chambers's trial, testified that she was dating Chambers in July of 2013. (ECF No. 27-38 at 160, 162.) According to Lacey, Chambers took Lacey's great-aunt's Saturn Vue, which had handicap license plates, on the morning of July 9, 2013. (*Id.* at 163.) Because Lacey answered "I don't remember" to many of the questions she was asked while on the stand, the prosecution was permitted to play a recording of Lacey's police interview for the jury. (*Id.* at 19.) That recording contained the following facts: (1) she saw Chambers leave their house the morning of July 9, 2013, at 8:00am, (2)

3

following the incident, Chambers "told her 'he got into some shit,'" (3) Chambers had a gun in their house two days before the incident, (4) she knew Chambers to associate with a woman named Lisa who lived in a mobile home part, and (5) a few weeks before the incident, Chambers indicated he wanted to rob Lisa, stating, "this bitch has so much money; rips people off; she's the main dope lady around; and I'm going to rob her one day." (ECF No. 18 at 24.)

Jennifer Corneal, a medical examiner with the Clark County Coroner's Office, testified that Bly "had a gunshot wound to his head." (ECF No. 27-43 at 30, 34–35.) Corneal confirmed that the methamphetamines in Bly's system was a "very large" amount. (*Id.* at 46.) And Corneal confirmed that it is possible that methamphetamines can cause hallucinations, aggressive behavior, violence, and irrational reactions. (*Id.* at 46–47.)

Bridgette Graham, who did not attend the trial and instead had her preliminary hearing testimony read to the jury, testified that Chambers picked her and his daughter, Erica, up on July 9, 2013, around 10:00 or 10:30am. (ECF Nos. 27-43 at 51; 27-1 at 68–70.) Chambers drove them to a trailer park to get some methamphetamine. (ECF No. 27-1 at 70–71, 75.) Graham, who "was coming down" from being high on methamphetamine, saw Chambers enter a trailer and "a few minutes later [she] heard . . . four [gun]shots." (*Id.* at 73, 82.) Graham exited the car to check on Chambers and heard a woman in the trailer screaming, "He's trying to rob me, he's trying to rob me." (*Id.* at 76.) Graham then saw Chambers, and they returned to the car. (*Id.* at 74.) During the car ride, Chambers kept repeated the phrase "he shouldn't be wrestling." (*Id.* at 75.) Chambers also said, "I tried to rob her, and then they had got up and . . . so I pulled out my gun." (*Id.* at 77.) Graham also testified that Chambers had "said . . . a couple of times [in the weeks preceding the homicide that] he was going to hit a lick," which means commit a robbery. (*Id.* at 81–82.)

During Chambers's trial counsel's cross-examination of Papoutsis,

Chambers's trial counsel posed questions supporting Chambers's defense that the shooting of Bly was accidental or was in self-defense. Under Chambers's versions of events, he went to Papoutsis's trailer to buy methamphetamine, but he did not have enough money. (ECF No. 27-33 at 152–53.) "When [Papoutsis] and [he] start[ed] arguing over the amount of the money [for the drugs], [Papoutsis] started accusing him of trying to shortchange [her] and trying to rob [her]." (*Id.* at 153.) Bly came out from the back of the trailer and confronted Chambers. (*Id.* at 154.) Bly had the gun, and during a struggle between Chambers and Bly, the gun went off. (*Id.*)

Chambers called Dr. Michael Levy, a specialist in addictive disease and expert in the field of toxicology. (ECF No. 27-42 at 89–90, 93.) Dr. Levy reviewed Bly's blood test and Papoutsis's urine test. (*Id.* at 93.) Bly's blood test showed that he had methamphetamine, amphetamine, and ephedrine in his system. (*Id.* at 94.) Dr. Levy estimated that Bly used methamphetamine six to eight hours before his blood was drawn and testified that methamphetamine starts to break down "around two to four hours" after ingestion. (*Id.* at 96.) Dr. Levy then testified that an individual who has used methamphetamine on a prolonged basis and is coming down from a methamphetamine high "may be delusional" and "may be hallucinating visually." (*Id.* at 99.) "[T]hose individuals, when they're in that tweaking state of mind, may be dangerous." (*Id.* at 99.) Papoutsis's urine test was positive for amphetamine, opiates, and benzodiazepines. (*Id.* at 100.)

### B.        Procedural background

The jury found Chambers guilty of second-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, and battery with the use of a deadly weapon. (ECF No. 27-49.) The jury found Chambers not guilty of burglary while in possession of a firearm and attempted robbery with the use of a deadly weapon. (*Id.*) Chambers pleaded guilty to ownership or possession of a firearm by a prohibited person. (ECF No. 27-48.) Chambers was sentenced

to four concurrent terms of life in prison without the possibility of parole. (ECF No. 28-10.) Chambers appealed, and on July 24, 2019, the Nevada Court of Appeals affirmed. (ECF No. 29-6.)

On March 24, 2021, Chambers filed a state post-conviction habeas corpus petition and supporting memorandum. (ECF Nos. 29-27, 29-28.) The state court denied the petition without appointing counsel and without holding an evidentiary hearing. (ECF No. 29-33.) Chambers appealed, and the Nevada Court of Appeals affirmed on February 3, 2022. (ECF No. 29-44.)

Chambers commenced this action on February 18, 2022, with the filing of his *pro se* petition. (ECF No. 1-1.) This Court appointed counsel to represent Chambers. (ECF No. 3, 9.) Chambers filed his counseled First-Amended Petition and counseled Second-Amended Petition on May 24, 2022, and November 18, 2022, respectively. (ECF Nos. 10, 18.) In his Second-Amended Petition, Chambers raises the following grounds for relief:

| | |
|---|---|
| 1a. | His trial counsel failed to consult and communicate. |
| 1b. | His trial counsel failed to interview witnesses. |
| 1c. | His trial counsel failed to file a pre-sentence motion to withdraw his guilty plea. |
| 1d. | His trial counsel failed to effectively advise him to testify. |
| 1e. | His trial counsel failed to investigate and prepare witnesses for sentencing. |
| 2. | His trial counsel failed to request an instruction concerning testimony by a methamphetamine addict. |
| 3. | He was denied the right to due process, a fair trial, and to present a defense due to the trial court's ruling allowing the prosecution to cross-examine him about his prior convictions if he testified. |
| 4. | The trial court erred in allowing a witness to testify via video teleconference. |
| 5. | The trial court erred in allowing a witness's preliminary hearing testimony to be read into evidence at trial. |
| 6. | The prosecution committed misconduct during closing arguments. |
| 7. | There were cumulative errors. |

(ECF No. 18.)

Respondents moved to dismiss the Second-Amended Petition. (ECF No. 30.) This Court granted the motion in part, finding (1) grounds 1b, 1c, 1d, and 1e to be technically exhausted and procedurally defaulted and (2) ground 7 to be unexhausted to the extent it includes trial counsel error. (ECF No. 41.) This Court then deferred consideration of whether Chambers can demonstrate cause and prejudice under *Martinez v. Ryan* to overcome the procedural default of grounds 1b, 1c, 1d, and 1e until after the filing of an answer and reply. (*Id.*) Following Chambers's notice of abandonment, this Court dismissed ground 7 to the extent it includes trial counsel error. (ECF No. 43.)

Respondents filed their Answer to the remaining grounds in the Second-Amended Petition on August 1, 2024. (ECF No. 54.) Chambers filed his Reply on March 17, 2025. (ECF No. 66.) This Court held oral argument on the Second-Amended Petition on March 6, 2026. (ECF No. 71.) In compliance with this Court's request at the oral argument, Respondents filed Chambers's Presentence Investigation Report and moved to seal the same. (ECF Nos. 72, 73.)

## II.  GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the first portion of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Lockyer v. Andrade*, 538 U.S. 63, 73, 75 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). And a state court decision involves an unreasonable application of Supreme Court precedent, within the second portion of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).

## III.   DISCUSSION

### A.   Ground 1—trial counsel ineffectiveness

In ground 1, Chambers alleges that his trial counsel was ineffective for failing to conduct adequate and thorough investigations in violation of the Sixth and Fourteenth Amendments. (ECF No. 18 at 6.)

#### 1.   Standard

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to

establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington v. Richter*, 562 U.S. 86, 104–05 (2011). In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 2.    Procedural default

Chambers previously acknowledged that grounds 1b, 1c, 1d, and 1e are technically exhausted but procedurally defaulted. (ECF No. 37 at 2.) However, he contended that he could demonstrate cause and prejudice to overcome these procedural defaults pursuant to *Martinez v. Ryan*. (*Id.*) This Court found that Chambers had arguably met three of the elements under *Martinez*: (1) he had no counsel during his initial-review collateral proceeding, (2) his state post-conviction petition was the initial proceeding regarding claims of ineffective assistance of trial counsel, and (3) Nevada law requires that a claim of ineffective of assistance of trial counsel be raised in a post-conviction habeas corpus proceeding. (ECF No. 41 at 5.) Because the analysis of prejudice under *Martinez*

to overcome these procedural defaults are necessarily intertwined with the merits of these grounds, this Court deferred a determination of the fourth element of *Martinez*: whether these grounds are substantial. (*Id.*) On this issue, this Court's review is de novo. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).

### 3.   Ground 1a—failure to consult and communicate

In ground 1a, Chambers alleges that his trial counsel failed to consult and communicate to learn his version of the events. (ECF No. 18 at 7.)

#### 1.   Background information

In support of this ground, Chambers points to an affidavit that he executed in 2019, detailing his trial counsel's lack of communication:

> Between 2013 and 2017, I was housed at the High Desert state Prison and between the approximate four (4) year period of awaiting trial, never once did [trial counsel] visit with me to discuss the facts and defenses of my case, and I had only one visit with my case investigator.
> The only time I had the opportunity to speak with [trial counsel] was during courtroom hearings, and even then he did not discuss any aspects of the facts of my case, did not discuss my side of the story in relation to the incident, or what defense he was actually presenting although I informed him that my actions were in self-defense to the victim's unprovoked attack on me.

(ECF No. 4 at 19–20.)

#### 2.   State court determination

In affirming the denial of his state habeas petition, the Nevada Court of Appeals held that Chambers failed to demonstrate ineffectiveness:

> Chambers argues the district court erred by denying his March 24, 2021, petition and later-filed supplement without first conducting an evidentiary hearing. In his petition, Chambers claimed his trial counsel was ineffective. To demonstrate ineffective assistance of trial counsel, a petitioner must show counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting

the test in *Strickland*). Both components of the inquiry must be shown. *Strickland*, 466 U.S. at 687. To warrant an evidentiary hearing, a petitioner must raise claims supported by specific factual allegations that are not belied by the record and, if true, would entitle him to relief. *Hargrove v. State*, 100 Nev. 498, 502–03, 686 P.2d 222, 225 (1984).

Chambers claimed that his trial counsel was ineffective for failing to properly communicate and consult with him. Chambers did not specify why he believed additional discussions with counsel were necessary or explain how additional discussions with counsel could have altered the outcome of the trial. Accordingly, Chambers failed to allege specific facts that demonstrated his counsel's performance fell below an objective standard of reasonableness or *a reasonable probability he would have refused to plead guilty and would have insisted on proceeding to trial had counsel performed differently.* Therefore, we conclude that the district court did not err by denying this claim without conducting an evidentiary hearing.

(ECF No. 29-44 at 2–3 (emphasis added).)

Chambers contends that the italicized portion of the Nevada Court Appeals' decision demonstrates a clear misunderstanding of the record because he did have a trial. (ECF No. 66 at 11.) This Court agrees. Chambers pleaded guilty to ownership or possession of a firearm by a prohibited person, but that was only after his jury trial on the remaining charges. Because the Nevada Court of Appeals' decision was based on an unreasonable determination of the facts, this claim will be reviewed de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires"); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo.").

### 3.    Analysis

Defense counsel has a duty to "consult with the defendant on important decisions and to keep the defendant informed of important developments." *Strickland*, 466 U.S. at 688; *see also United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) ("Adequate consultation between attorney and client is an

essential element of competent representation of a criminal defendant. While the amount of consultation will depend on the facts of each case, the consultation should be sufficient to determine all legally relevant information known to the defendant." (Internal citation omitted)). Chambers fails to demonstrate that his trial counsel did not meet this duty. Chambers alleges that his trial counsel never visited him in jail, only had his investigator visit on one occasion, and never discussed the facts of the case with him when they would see each other at court hearings. However, these allegations are unsupported by anything other than Chambers's own self-serving statements. *See, e.g., Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (rejecting a petitioner's claim, in part, because "[o]ther than [the petitioner]'s own self-serving statement, there [was] no evidence" to support his allegations); *Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (explaining that the petitioner's "self-serving statement, made years later," was insufficient to support the petitioner's claim).

Further, Chambers fails to articulate what further facts he desired to discuss with his trial counsel. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Rather, the records shows that Chambers's trial counsel argued and presented evidence that Chambers acted in self-defense, which is the very theory upon which Chambers wished to proceed upon. During his opening statement, Chambers's trial counsel argued that (1) Bly "was fueled, fired up and flying high on methamphetamine," (2) Bly "storm[ed] out of the back of the trailer to the front and confront[ed Chambers]," (3) Bly "gets in [Chambers's] face, bumps his chest against him," (4) because Bly had a gun, Chambers "had no other option to defend himself," and (5) "[a] struggle ensue[d] . . . over control of the gun," resulting in Bly and Papoutsis being shot. (ECF No. 27-33 at 9–11.) And during closing arguments, he argued that "[t]his is a self-defense claim." (ECF No. 27-44 at 52.)

12

As such, even if Chambers's trial counsel could have potentially done a better job of communicating with Chambers, Chambers fails to demonstrate ineffectiveness. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983) ("[R]eject[ing] the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel."). Chambers is not entitled to federal habeas relief for ground 1a.

### 4.   Ground 1b—failure to interview witnesses

In ground 1b, Chambers alleges that his trial counsel failed to interview Daniel Plumlee, who would have explained why Bly likely would have been the initial aggressor. (ECF No. 18 at 8.)

### 1.   Evidence to be considered

Respondents argue that this Court is precluded from considering Plumlee's declaration. (ECF No. 54 at 13.)

28 U.S.C. § 2254(e)(2) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (A) the claim relies on—
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In *Shinn v. Ramirez*, the Supreme Court reinforced that the federal court may not consider any facts beyond the factual record presented to the state post-conviction relief court, unless one of the exceptions of § 2254(e)(2) applies. 596 U.S. 366, 382 (2022). The *Ramirez* Court also held that, with respect to procedurally defaulted claims not adjudicated on their merits in state court, the federal habeas court may not hold an evidentiary hearing or otherwise consider

new evidence, either regarding the question of cause and prejudice relative to a procedural default or regarding the merits of the claim, unless the requirements of § 2254(e)(2) are met. *Id*. at 382–91.

Chambers does not argue that he can meet the requirements of § 2254(e)(2). (ECF No. 66 at 8–9.) Rather, he argues that he does not need to meet these requirements because he did not "fail[ ] to develop the factual basis of [these] claim[s] in State court." (*Id*.) In support of this argument, Chambers explains that he twice sought— and was denied—the appointment of counsel and an evidentiary hearing in state court. (*Id*.)

§ 2254(e)(2) applies when "there is lack of diligence . . . attributable to the prisoner." *Williams*, 529 U.S. at 432. A finding of diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id*. at 435. A prisoner "is not at fault" for purposes of § 2254(e)(2) "when his diligent efforts to perform an act are thwarted . . . by the conduct of another or by happenstance." *Id*. at 432. When "[a]n indigent prisoner . . . is denied counsel and discovery[, he] has no practical likelihood of" investigating his post-conviction claims in state court. *Rodney v. Garrett*, 116 F.4th 947, 957 (9th Cir. 2024). In this situation, a petitioner has done "all that he could to develop the evidentiary bases of his . . . claims in state court," so he cannot be found to have "fail[ed] to develop the state-court record within the meaning of § 2254(e)(2)." *Id*.

Here, Chambers requested that the state court appoint him post-conviction counsel and provide an evidentiary hearing, but the state court found that (1) Chambers "is not entitled to the appointment of counsel" and (2) Chambers's "claims do not require an evidentiary hearing." (ECF No. 29-33 at 20, 23.) Because Chambers diligently pursued development of the state-court record in this matter but was thwarted by the state court from doing so, this Court finds that § 2254(e)(2) does not apply. Thus, this Court is permitted to consider

Plumlee's declaration.

## 2. Background information

At the trial, the prosecution called Plumlee as a witness to showcase that a Chambers's wallet was found in Papoutsis's trailer after the homicide. (ECF No. 27-38 at 21.) As part of his foundational testimony, Plumlee testified that he spoke with Papoutsis and Bly on the morning of the homicide and that no one was angry or "acting sort of differently than [he] would anticipate." (*Id.* at 10.) Chambers's trial counsel cross-examined Plumlee. (*Id.* at 23–26.)

Chambers contends that his trial counsel should have interviewed Plumlee so that the following information, which is included within Plumlee's declaration executed after the trial, could have been presented at the trial: (1) he worked at Vans Trailer Oasis in July 2013 and was acquainted with Bly, Papoutsis, and Chambers, who "were all heavy methamphetamine users," (2) he too was an methamphetamine user at the time, (3) Papoutsis sold methamphetamine and Chambers was one of her buyers, (4) he spoke with Bly and Papoutsis the morning of the homicide, and their "discussion revolved around a love triangle between Bly, Angel (Bly's wife), and [Chambers]," (5) Bly told Plumlee that Chambers "had taken a naked picture of Angel and texted it to Bly," making "Bly . . . extremely upset," and (6) Bly "seemed devastated." (ECF No. 19-2.)

## 3. Investigative standard

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's "most important defense." *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). It also includes investigating and introducing evidence that

demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez,* 174 F.3d 1067, 1070 (9th Cir. 1999). In assessing counsel's investigation, the court must conduct an objective review of counsel's performance, measured for "reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688. This includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Id.* at 689; *see also Wiggins v. Smith,* 539 U.S. 510, 523 (2003). Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690.

### 4.   Analysis

While Chambers's trial counsel allegedly failed to interview Plumlee before trial, he did cross-examine Plumlee during the preliminary hearing. (*See* ECF No. 27-1 at 110–118.) During the preliminary hearing, Plumlee did not mention anything about the love triangle between Bly, Chambers, and Bly's wife—indeed, Plumlee did not mention that he had any sort of conversation with Papoutsis and Bly before the homicide. (*Id.* at 104–119.) Rather, in response to the prosecution asking "[w]hat was the first thing that day that caught your attention" regarding the homicide, Plumlee answered, "[h]earing gunshots." (*Id.* at 105.) Given these circumstances, Chambers's trial counsel was not put on notice that Plumlee had a conversation—much less a relevant conversation—with Bly before the shooting. *See Babbitt v. Calderon,* 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel is not deficient for failing to find . . . mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence."). This lack of notice belies the contention that Chambers's trial counsel's investigation into Plumlee was unreasonable. Rather, having thoroughly cross-examined Plumlee at the preliminary hearing and not gaining any knowledge that further interviewing was necessary, this Court finds that

Chambers fails to demonstrate that his trial counsel's representation fell below an objective standard of reasonableness.

Moreover, even if Chambers's trial counsel acted deficiently, Chambers fails to demonstrate prejudice. Plumlee testified at the trial that neither Papoutsis nor Bly were angry or acting differently than normal during the conversation before the shooting. Plumlee's declaration contradicts his own testimony. In his declaration, Plumlee states that this conversation concerned a love triangle and that Bly was upset and devastated. Given this contradiction, it is mere speculation that the jury would have accepted Plumlee's additional testimony.

Accordingly, because Chambers's ineffective assistance of trial counsel claim is not substantial due to his failure to demonstrate ineffectiveness under *Strickland*, Chambers fails to overcome the procedural default of ground 1b. Ground 1b is dismissed.

### 5.   Ground 1c—failure to file a motion to withdraw his plea

In ground 1c, Chambers alleges that his trial counsel failed to file a presentence motion to withdraw his guilty plea to count 6. (ECF No. 18 at 9.)

### 1.   Background information

After the jury read its verdict, finding Chambers guilty of second-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, and battery with the use of a deadly weapon, the trial court excused the jury so that "the parties [could discuss] a separate procedural issue," namely, the second portion of the bifurcated trial.[2] (ECF No. 27-50 at 9–10.) Chambers's trial counsel explained that he was filing a guilty plea memorandum regarding count 6 of the indictment: ownership or possession of a firearm by a

---

[2] *See Morales v. State,* 143 P.3d 463, 464 (Nev. 2006) (concluding that a trial "court may resort to bifurcation" when "the State, in the indictment or criminal information, joins a charge of unlawful possession of a firearm by an ex-felon with other substantive criminal violations," instead of requiring complete severance).

prohibited person. (*Id.* at 11.) According to Chambers's trial counsel, he "spoke to Mr. Chambers and [his] legal advice and opinion was it [would] basically be a waste of everyone's time to move forward with the jury deciding the ex-felon in possession" charge because (1) the jury already found that Chambers possessed a gun given their finding of the deadly weapon enhancement to the other charges and (2) "[t]here's no way of disputing the prior convictions." (*Id.*) However, Chambers's trial counsel clarified that Chambers was "not waiving any of his appeal rights as to the verdict or pretrial issues or issues that might have arisen during the trial." (*Id.*)

The trial court canvassed Chambers, Chambers answered in the affirmative when asked if he signed the guilty plea agreement "freely and voluntarily," and Chambers pleaded guilty to possession of a firearm by a prohibited person. (*Id.* at 11–14.) The trial court found that Chambers's "plea of guilty of ownership or possession of [a] firearm by a prohibited person is freely and voluntarily given." (*Id.* at 14.) The trial court brought the jury back into the courtroom and then released them. (*Id.* at 17.)

Before sentencing, Chambers sent a letter to the trial court, asking the trial court to allow him "to take [h]is guilty plea back for ex-felon possession [of a] firearm." (ECF No. 28-4 at 2.) Chambers then sent a second letter to the trial court, stating that his "plea was not knowingly [and] intelligently entered into." (ECF No. 28-7 at 3.) At the sentencing hearing, the trial court noted that it had received and reviewed Chambers's letters, but it took no action on them. (ECF No. 28-9 at 4.)

### 2. Analysis

Chambers argues that his trial counsel never ensured that he would receive a benefit for pleading guilty to count 6. (ECF No. 18 at 9.) Chambers also argues that pleading guilty to count 6 meant that he was conceding he had a firearm, which was the opposite of his defense at trial that Bly was the one with the gun.

(*Id.*) This Court finds these arguments unpersuasive.

As Chambers correctly notes, Nevada's standard for pre-sentencing plea withdrawals is more lenient than post-sentencing plea withdrawals. *See Stevenson v. State*, 354 P.3d 1277, 1281 (Nev. 2015) ("[T]he district court must consider the totality of the circumstances to determine whether permitting withdrawal of a guilty plea before sentencing would be fair and just."); Nev. Rev. Stat. § 176.165 ("[A] motion to withdraw a plea of guilty . . . may be made only before sentence is imposed or imposition of sentence is suspended. To correct manifest injustice, the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea."). However, Chambers fails to demonstrate that his trial counsel acted deficiently in not moving to withdraw his guilty plea before sentencing. As Chambers's trial counsel reasonably stated at the end of Chambers's trial, it would have been fruitless to have had the jury render a verdict on count 6 given that it had already found that Chambers committed second-degree murder, attempted murder, and battery all with a deadly weapon—namely, a gun. *See Morris v. State*, 281 P.3d 1203 (Nev. 2009) (holding that, after the jury returned its verdict on burglary while in possession of a firearm, attempted robbery with the use of a deadly weapon, first-degree kidnapping with the use of a deadly weapon, assault with a deadly weapon, and carrying a concealed firearm, "a rational jury could have found [the defendant] guilty of possession of a firearm by an ex-felon beyond a reasonable doubt" given that the prosecution admitted his previous judgment of conviction). Consequently, even in the face of not gaining a benefit from the prosecution for doing so, Chambers's trial counsel soundly advised him to plead guilty to count 6 instead of undergoing an ill-fated jury trial.

Turning to Chambers's second argument, it is true that pleading guilty to count 6 meant that Chambers was forced to concede that he possessed a firearm, but this concession was not directly in opposition of his defense at trial that the

19

firearm belonged to Bly. Because numerous witnesses testified that they saw Chambers with the firearm when he left the trailer, there was sufficient evidence to convict him of possession of a firearm even if he was not the one who possessed the firearm in the first place. *Cf. Woodall v. State*, 627 P.2d 402, 403 (Nev. 1981) (holding that the "evidence adduced at trial fail[ed] to show appellant possessed or exercised dominion and control over the firearm in question" because it "was discovered in a truck occupied by both appellant and his companion"); *Black's Law Dictionary* (12th ed. 2024) (defining possession as "[t]he fact of having or holding property in one's power; the exercise of dominion over property").

Because Chambers's ineffective assistance of trial counsel claim is not substantial due to his failure to demonstrate deficiency under *Strickland*, Chambers fails to overcome the procedural default of ground 1c. Ground 1c is dismissed.

### 6.    Ground 1d—failure to advise him to testify

In ground 1d, Chambers alleges that his trial counsel failed to effectively advise him to testify, which meant that no evidence was presented to support his self-defense theory. (ECF No. 18 at 10.)

As will be discussed further in ground 3, Chambers's trial counsel filed a pre-trial motion to preclude the prosecution from cross-examining Chambers—if he chose to testify—about his prior convictions for two counts of robbery with the use of a deadly weapon and one count of first-degree kidnapping. (ECF No. 27-10.) The trial court denied the motion. (ECF No. 27-13 at 3–4.) Given the risk that Chambers faced at trial if he were to testify—namely, the prosecution impeaching him with his prior convictions—Chambers fails to demonstrate that his trial counsel was ineffective in advising him not to testify. Moreover, the decision of whether to testify, regardless of the advice of counsel, is up to the defendant. *See Rock v. Arkansas*, 483 U.S. 44, 49 (1987) ("[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense.");

20

*Jones v. Barnes*, 463 U.S. 745, 751 (1983) (explaining that the decision of whether to testify on his own behalf is one "the accused has the ultimate authority to make"). And here, Chambers's trial counsel stated that he had spoken to Chambers "[o]n numerous occasions" about his right to testify and that it was his "understanding" that Chambers was choosing not to testify. (ECF No. 27-42 at 85.) Chambers was then thoroughly canvassed by the trial court about his rights and stated, "I don't want to testify." (*Id.* at 85–87.)

Given this record, this Court finds that Chambers's ineffective assistance of trial counsel claim is not substantial. Because Chambers fails to overcome the procedural default of ground 1d, it is dismissed.

### 7. Ground 1e—failure to prepare witnesses for sentencing

In ground 1e, Chambers alleges that his trial counsel failed to investigate and prepare witnesses for sentencing. (ECF No. 18 at 11.) Specifically, Chambers alleges that his trial counsel should have called his mother, sister, and cousin to testify on his behalf. (*Id.* at 11–12.)

### 1. Evidence to be considered

Respondents argue that this Court is precluded from considering Chambers's mother's, sister's, and cousin's declarations, which Chambers relies upon to support this ground. (ECF No. 54 at 13.) For the reasons discussed within ground 1b, *supra*, this Court finds that Chambers diligently pursued development of the state-court record in this matter but was thwarted by the state court from doing so, so § 2254(e)(2) does not apply and consideration of Chambers's evidence in support of this ground is permitted.

### 2. Background information

At the sentencing hearing, Chambers's trial counsel argued that (1) Chambers should not be sentenced under the habitual criminal statute due to "the State's failure to comply with the procedural requirements" regarding notice to seek habitual treatment, (2) Chambers acted in self-defense, and (3) "everyone

is in agreement" that "Chambers has had a lengthy drug addiction." (ECF No. 28-9 at 7–10.) The trial court based its sentencing decision on the following:

> [The] Court sees here that from the evidence that the Court saw at trial and from the Court's understanding of the meaning of the jury's verdict here by all accounts the Defendant brought a gun to somebody's house. Maybe it was to get revenge, maybe it was just to participate in a drug deal, we don't know exactly the motive but he brought a gun to somebody's house and used it and killed the resident, and then he fled.
>
> Six prior felony convictions. There's a history of repeated and escalating violence here. I think the Defendant is a clear recidivist. Looking at the felony convictions that have been presented by the District Attorney's office for use in this Court's discretion in determining whether to treat the Defendant as a large habitual the Court believes that these felony convictions are not too remote in time considering that the felonies, two of them were in 2002, they're not too remote in time considering the violence that's involved, the escalation of the violence in considering the age of the Defendant, and considering that there's only been brief periods of time when the Defendant has seemingly stayed out of trouble while not in custody.
>
> I think the Defendant, as evidenced by the prior felonies, is a danger to community. I think there's extremely remote chance of rehabilitation. It's a horrible situation but a life was taken under violent circumstances.
>
> So, for all these reasons, and the Court has considered all of the felony convictions that are in record here, the Court is gonna treat the Defendant as a large habitual felon.

(*Id.* at 17–18.)

Chambers argues that his trial counsel should have presented the following witnesses and testimony to change the trial court's sentencing decision. First, Mary Louise Brown, Chambers's mother, declared that she would have testified that (1) she had Chambers's sister when she was only 13 years old and had Chambers when she was 15 years old, (2) Chambers's older sister suffered from brain damage and died when she was only three years old, (3) Chambers's father was not around while Chambers was growing up, (4) she "shot heroin intravenously" during Chambers's early childhood, (5) Chambers was primarily raised by his grandparents, (6) her addiction "led [her] into a life of crime to support [her] habit," resulting in her being sent to prison three times during Chambers's childhood, (7) Chambers's first child was stillborn, and (8) Chambers "got into drugs and all that came along with the drugs, like crime and violence."

(ECF No. 19-1.)

Second, Ebony Lay Randle, Chambers's half-sister, would have testified that (1) Chambers's dad was a heavy drinker, (2) Chambers witnessed his father be beat into unconsciousness by police when he was an adolescent, (3) Chambers grew up in a rough neighborhood and "[g]angs, violence, fighting, and drugs were everywhere, every day, even in the schools," and (4) Chambers used and sold drugs, which controlled his life for years. (ECF No. 19-3 at 7–9.)

Third, Justin Allen, Chambers's cousin, would have testified that (1) Chambers's best friend growing up was shot and killed, which was very hard on Chambers, (2) Chambers started using drugs in his early twenties, (3) Chambers "went downhill" after his separation with his first-child's mother, and (4) Chambers initially did well after being released on parole before the instant offense, but he eventually started using drugs again. (ECF No. 19-3 at 12–13.)

### 3.    Standard

Counsel's performance at the penalty phase is measured against "prevailing professional norms." *Strickland*, 466 U.S. at 688. When challenging a trial counsel's actions in failing to present mitigating evidence during a sentencing hearing, the "principal concern . . . is not whether counsel should have presented a mitigation case[, but instead] . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 522-23 (emphasis in original) (explaining that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing"). "[C]ounsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence'" during the sentencing phase of a trial. *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (alternations in original) (quoting *Williams*, 529 U.S. at 393). Because the

sentencing court has wide "latitude to consider amorphous human factors," "[i]t is imperative that all relevant mitigating information be unearthed for consideration." *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015) (quoting *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014)) (internal quotation marks omitted). "To that end, trial counsel must inquire into a defendant's social background, family abuse, mental impairment, physical health history, and substance abuse history; obtain and examine mental and physical health records, school records, and criminal records; consult with appropriate medical experts; and pursue relevant leads." *Id.* (internal quotation marks omitted).

### 4.    Analysis

Due to the lack of evidentiary hearing during Chambers's state habeas proceedings, it is unclear why Chambers's trial counsel did not investigate or present family members at the sentencing hearing to testify about Chambers's social background—instead deciding to focus on Chambers's drug usage and procedural issues with the prosecution's notice of intent to seek habitual treatment. However, even if Chambers's trial counsel was deficient in this regard, Chambers fails to demonstrate prejudice.

Although Brown's, Randle's, and Allen's testimonies could have painted a better picture of Chambers for the trial court to consider, this Court cannot confidently determine that an objective decisionmaker would have found that these supplementary details were sufficient to change Chambers's sentence. *See Strickland*, 466 U.S. at 695 (explaining that the question is whether an "[objective] decisionmaker [who] is reasonably, conscientiously, and impartially applying the standards that govern the decision" would grant relief, meaning the Court uses an "objective approach" that excludes "idiosyncrasies of the particular decisionmaker"); *White v. Ryan*, 895 F.3d 641, 670 (9th Cir. 2018). While Chambers's childhood history was not included in his presentence investigation

report,[3] a deeper understanding of Chambers's history would not have necessarily provided explanatory mitigating evidence. As the Court of Appeals for the Ninth Circuit has stated, it is rare that habeas relief is granted "based solely upon humanizing, rather than explanatory, mitigating evidence in the face of extensive aggravating circumstances." *Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005) ("[W]hile counsel erred in failing to investigate and present the potential mitigation testimony of many family members, friends, and associates of Allen's, we cannot conclude that there is a reasonable probability, had trial counsel presented the potential mitigation evidence developed during habeas, that the jury would have weighed the evidence in favor of a life sentence."); *see also Wong v. Belmontes*, 558 U.S. 15, 27–28 (2009) ("It is hard to imagine expert testimony and additional facts about Belmontes' difficult childhood outweighing the facts of [the] murder."). Here, the most compelling information cultivated in Chambers's declarations is his mother's agonizing and troublesome youth, but, importantly, this information is only tangentially related to Chambers given that he was raised primarily by his grandparents.

Further, before committing the instant crime, Chambers had already received six prison sentences in four separate cases. (ECF No. 73-1 at 7.) In two instances, Chambers received parole but violated the conditions thereof and was returned to prison. (*Id.*) In fact, Chambers had been granted parole most recently on July 1, 2012, meaning he was on parole at the time of the instant offense. (*Id.* at 7, 9.) Chambers's criminal history started out with possession of drug charges, but he eventually graduated into more violent offenses: robbery, burglary, first-degree kidnapping, domestic battery, robbery with the use of a deadly weapon, first-degree kidnapping with the use of a deadly weapon, and burglary with the

---

[3] Chambers's Presentence Investigation Report only stated that Chambers "was raised by his maternal grandparents since birth" and that "he did not know why his biological parents did not take part in his upbringing." (ECF No. 73-1 at 4.)

use of a deadly weapon. (*Id.* at 5–7.) Thus, during most of Chambers's adult life—from ages 19 to 45—he was either in prison or engaging in criminal activities. Given this progression, it is not surprising that the trial court's sentencing decision was primarily based on concerns about Chambers's violence, his lack of rehabilitation while in prison previously, and the need to keep the community safe. Brown's, Randle's, and Allen's testimonies would not have refuted these concerns.

Chambers's ineffective assistance of trial counsel claim is not substantial due to his failure to demonstrate prejudice under *Strickland*. As such, Chambers fails to overcome the procedural default of ground 1e, so ground 1e is dismissed.

### B.    Ground 2—trial counsel's failure to request an instruction

In ground 2, Chambers alleges that his trial counsel was ineffective for failing to request a special cautionary instruction concerning testimony by a methamphetamine addict in violation of the Sixth and Fourteenth Amendments. (ECF No. 18 at 13.)

### 1.    State court determination

In affirming the denial of his state habeas petition, the Nevada Court of Appeals held that Chambers failed to demonstrate deficiency or prejudice regarding his trial counsel not requesting a special cautionary instruction:

> To demonstrate ineffective assistance of trial counsel, a petitioner must show counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown. *Strickland*, 466 U.S. at 687. To warrant an evidentiary hearing, a petitioner must raise claims supported by specific factual allegations that are not belied by the record and, if true, would entitle him to relief. *Hargrove v. State*, 100 Nev. 498, 502–03, 686 P.2d 222, 225 (1984).
>     . . . .
> Chambers claimed that his trial counsel was ineffective for

26

failing to request a cautionary instruction concerning the surviving victim's testimony because of her status as a drug addict. The district court instructed the jury concerning the credibility or believability of witnesses generally, and Chambers did not demonstrate any failure by counsel to request an additional instruction concerning the credibility of the surviving victim fell below an objective standard of reasonableness. Chambers also did not demonstrate a reasonable probability of a different outcome at trial had counsel requested an instruction concerning the surviving victim's testimony. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

(ECF No. 29-44 at 2, 4–5.)

## 2. Analysis

Chambers cites *Champion v. State* to support his argument that his trial counsel should have requested a cautionary instruction regarding Papoutsis's testimony given that she was a known methamphetamine addict. (ECF No. 18 at 14.) In *Champion*, the Nevada Supreme Court held that "[w]hen the State adduces testimony by an addict-informer, the defendant is entitled to careful instructions cautioning the jury of the care which must be taken in weighing such testimony." 490 P.2d 1056, 1057 (Nev. 1971) (internal quotation marks omitted). However, *Champion* is dissimilar given that Papoutsis was not an informer. *See Crowe v. State*, 441 P.2d 90, 94-95 (Nev. 1968) (explaining that an informer is someone paid by law enforcement to obtain evidence for convictions), *modified on other grounds by Tellis v. State*, 445 P.2d 938, 940 (1968). Further, as the Nevada Court of Appeals reasonably noted, the jury was instructed on witness credibility generally,[4] so an additional instruction regarding a witness's credibility as it relates to drug and alcohol issues would have been cumulative. *See Carter v. State*, 121 P.3d 592, 596 (Nev. 2005) (stating that trial courts in Nevada do not have to accept duplicitous jury instructions). Accordingly, because a cautionary

[4] *See* ECF No. 27-47 at 56 ("The credibility or believability of a witness should be determined by his manner upon the stand, his relationship to the parties, his fears, motives, interests or feelings, his opportunity to have observed the matter to which he testified, the reasonableness of his statements and the strength or weakness of his recollections.").

27

instruction was not mandated or even likely to have been included by the trial court, the Nevada Supreme Court reasonably concluded that Chambers fails to demonstrate deficiency or prejudice. Because the Nevada Court of Appeals' determination was neither contrary to, nor an unreasonable application of, *Strickland* and was not based on an unreasonable determination of the facts, Chambers is not entitled to federal habeas relief for ground 2.

### C.    Ground 3—right to present a defense

In ground 3, Chambers alleges that he was denied the right to due process and a fair trial and the right to present a defense under the Fifth, Sixth, and Fourteenth Amendments because the trial court refused to preclude the prosecution from cross-examining him about his prior convictions if he chose to testify. (ECF No. 18 at 16.)

### 1.    Background information

Chambers's trial counsel filed a pre-trial motion to preclude any evidence of Chambers's prior convictions. (ECF No. 27-10.) In 2003, Chambers had been convicted of two counts of robbery with the use of a deadly weapon and one count of first-degree kidnapping. (*Id.* at 10.) Within his pre-trial motion, Chambers argued, *inter alia,* that his "testimony is of paramount importance . . . [b]ecause the only people who can testify about what happened inside the trailer house is one of the surviving alleged victims and [him]." (*Id.* at 7.) However, Chambers argued that he "is legitimately concerned that if he were to take the stand to tell the jury what happened inside the trailer house, the State will seek to introduce his three convictions from 2003." (*Id.* at 4.) The trial court denied the motion at a pre-trial hearing, finding Chambers's prior convictions to be probative and not overly prejudicial:

> I read the argument carefully and I understand and thank you for providing the Ninth Circuit cases that you did which outline the factors that the Court should consider. I did consider those factors and others. Unfortunately, I'm going to deny the motion in limine

pursuant to NRS 50.095.

I do believe that the prior felony convictions for robbery with use of a deadly weapon and first-degree kidnapping are relevant and admissible. I believe that they go to the issue of credibility. Credibility is an extremely critical issue in this particular case so the evidence is highly probative. I don't think it's unfairly prejudicial to admit that evidence here considering Defendant did receive parole shortly before the commission of the offenses in this case. The prior cases are violent crimes against persons like the crimes in this case. And I think that also any prejudice can be mitigated by cautionary instruction as well as voir dire that you can conduct. So I think the probative value of the prior felony convictions outweighs any unfair prejudice, and it's admissible under 50.095 and no exception applies here.

(ECF No. 27-13 at 3–4.)

### 2.   Standard

"[I]t [is] clear that the introduction of unduly prejudicial evidence could, in certain cases, violate the Due Process Clause." *Andrew v. White*, 604 U.S. 86, 96 (2025). However, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). The issue before this Court is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995). Not only must there be "*no permissible inference the jury may draw from the evidence*," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

### 3.   State court determination

In affirming Chambers's judgment of conviction, the Nevada Court of Appeals held that admission of Chambers's prior convictions was permissible

29

under Nevada law and did not unconstitutionally prevent him from testifying:

Chambers argues that the district court erred by denying his motion in limine and failing to suppress his 2003 convictions if he chose to testify, contending that the convictions were too remote in time to be admissible under NRS 50.095, and that they were more prejudicial than probative. Chambers further contends that because of this, he could not testify and therefore was denied the opportunity to present a meaningful defense. We disagree.

This court "review[s] a district court's decision to admit or exclude evidence for an abuse of discretion." *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008). It is well established in Nevada law that evidence of prior felony convictions may be used to impeach criminal defendants who choose to testify. NRS 50.095; *Anderson v. State*, 92 Nev. 21, 23, 544 P.2d 1200, 1201 (1976). However, district courts must exclude evidence of a prior conviction if the "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035(1); *see also Wesley v. State*, 112 Nev. 503, 510, 916 P.2d 793, 798-99 (1996) (explaining that the legislature intended district courts to balance the probative value versus the prejudicial effect before admitting evidence of criminal convictions).

Here, Chambers' 2003 convictions were not too remote in time. NRS 50.095 permits evidence of felony convictions where (1) the crime for which the defendant was convicted was punishable by death or imprisonment for more than one year, and (2) no more than ten years has elapsed since the defendant's release from confinement or since the expiration of his or her parole or probation, whichever is later. Chambers had only recently been paroled for his 2003 convictions when he committed the crimes related to this case in 2013. Thus the 2003 convictions were admissible to impeach Chambers' credibility because not "more than 10 years ha[d] elapsed since . . . [t]he expiration of the period of [his] parole." NRS 50.095(2)(b).

Chambers next argument—that the district court failed to properly weigh the probative versus prejudicial effect in admitting his prior convictions—is unpersuasive. The record supports that the court considered the probative value of the convictions versus their prejudicial effect. *See United States v. Wallace*, 848 F.2d 1464, 1473 (9th Cir. 1988) (articulating factors for courts to consider when weighing the probative value of prior convictions versus their prejudicial effect). Although this case is not binding on Nevada courts, the district court explicitly stated that it considered the *Wallace* factors when ruling on Chambers' motion in limine. Ultimately, the district court determined that the convictions were relevant to credibility, were not unfairly prejudicial, and that any potential prejudice could be cured via a cautionary instruction and

voir dire if Chambers testified. Therefore, we conclude that the district court did not abuse its discretion when weighing the probative versus prejudicial effect of Chambers' prior convictions.

> [FN1] Chambers also argues that his prior convictions did not have significant impeachment value as they did not involve crimes of dishonesty. As dishonesty is not a factor under NRS 50.095, we find this argument unpersuasive.

Additionally, we note that although Chambers' prior convictions were similar to charges for which he was on trial, e.g., attempted robbery, Nevada law has never prohibited the admission of such evidence. *See, e.g., Yates v. State*, 95 Nev. 446, 450, 596 P.2d 239, 242 (1979) (explaining that under Nevada law evidence of similar crimes is admissible to attack a defendant witness' credibility). Therefore, we conclude that the district court did not abuse its discretion when it denied Chambers' motion in limine.

> [FN2] We acknowledge Chambers' argument that the district court's denial of his motion in limine prevented him from testifying, but find it equally unpersuasive. In *Yates*, the Supreme Court of Nevada addressed this exact issue and concluded that "appellant's anticipation of the state's use of his prior felony convictions may have been a strong factor affecting his decision not to testify . . . . [T]here are a number of compelling reasons . . . that affect an accused's decision to forego testifying." 95 Nev. at 450, 596 P.2d at 242. Moreover, the *Yates* court explained that a rule prohibiting the use of "such conviction evidence would enable an accused to appear as a person whose character entitled him to complete credence, when the facts of his life are to the contrary." *Id.* at 451, 596 P.2d at 242 (quoting *United States v. Simpson*, 445 F.2d 735, 737 (D.C. Cir. 1970)).

(ECF No. 29-6 at 3–6.)

### 4.     Analysis

Nevada law provides in pertinent part that, "[f]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is admissible but only if the crime was punishable by . . . imprisonment for more than 1 year" and if not "more than 10 years has elapsed since (a) [t]he date of the release of the witness from confinement; or (b) [t]he expiration of the period

31

of the witness's parole, probation or sentence, whichever is the later date."[5] Nev. Rev. Stat. § 50.095(1), (2); *Yates v. State*, 596 P.2d 239, 241 n.2 (Nev. 1979) ("Prior felony convictions which are not too remote are deemed relevant to the credibility of any witness."); *Shults v. State*, 616 P.2d 388, 392 (Nev. 1980) (explaining that "when evidence of prior crimes is relevant and admissible, the trial court should cautiously weigh the probative value against the bias or prejudice likely to result," and "although a witness may be impeached with evidence of prior convictions, NRS 50.595, '(t)he details and circumstances of the prior crimes are, of course, not appropriate subjects of inquiry'"). The Nevada Court of Appeals' determination that the trial court correctly applied Nevada law in denying Chambers's motion in limine to preclude the admission of evidence is unassailable on federal habeas review.

Rather, the issue here is whether the trial court's evidentiary ruling, which would have allowed the prosecution to ask Chambers about his prior convictions if he chose to testify, violated Chambers's due process rights by impeding his ability to present a defense. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *Washington v. Texas*, 388 U.S. 14, 19 (1967) (explaining that an accused "has the right to present his own witnesses to establish a defense" and that "[t]his right is a fundamental element of due process of law"); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984))). This Court acknowledges that the trial court's ruling put Chambers in the difficult position of having to choose whether

---

[5] Chambers does not dispute that his prior convictions were within the 10-year window—in fact, he had just recently been paroled for his prior convictions when he committed the instant offense.

to (1) remain silent at trial and forego the opportunity to present his own testimony to support his theory of self-defense or (2) testify and risk the jury disbelieving his testimony due to his prior convictions. However, this difficult decision does not warrant a finding that Chambers's due process rights were violated.

Because the Nevada Court of Appeals' determination was neither contrary to, nor an unreasonable application of, federal law and was not based on an unreasonable determination of the facts, Chambers is not entitled to federal habeas relief for ground 3.

### D.    Ground 4—witness testimony via two-way video

In ground 4, Chambers alleges that he was denied the right to due process and a fair trial when the trial court allowed Lacey to testify via two-way video in violation of the Confrontation Clause and the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 18 at 18.)

### 1.    Background information

On the fourth day of trial, the prosecution moved to present Lacey's testimony via two-way video, explaining that (1) Lacey "lives more than 100 miles away," (2) Lacey "recently had a heart attack and the stress of testifying will be too harmful to her health," and (3) "[t]he State has done everything in its power to secure her presence for testimony during this trial." (ECF No. 27-37.) The trial court held a hearing on the motion. (*See* ECF No. 27-38 at 94.) During that hearing, the prosecution stated that (1) Lacey provided sworn testimony to a magistrate judge in Arizona, (2) that magistrate judge "found that she's medically incapable of coming," (3) Lacey would be testifying from a courtroom in Arizona, and (4) Lacey would be able to be seen by individuals in the Las Vegas courtroom and would be able to see what was happening in the Las Vegas courtroom as well. (*Id.* at 95–100.)

Chambers's trial counsel countered that allowing Lacey to testify via two-

way video deprived Chambers of his right to face his accuser "face to face." (*Id.* at 107.) Chambers's trial counsel then argued that the prosecution needed to submit additional proof of Lacey's heart attack or medical condition beyond just her word and pictures of her high blood pressure medication, that individuals with heart attacks are not necessarily prohibited from traveling, and he was not present before the magistrate judge in Arizona to cross-examine Lacey. (*Id.* at 101–03.) The trial court gave its preliminary determination on the issue:

> I believe that if we can establish that the witness is in such poor health that she can't travel, then I'm satisfied that video testimony can be provided. I'm just not sure that I have enough yet of her poor health. I'm not convinced that her health is so poor. And I'm wondering what more we can get because the medication shows she has high blood pressure. If I had a heart attack I'd be able to get some documentation that I had a heart attack.

(*Id.* at 109.) The trial court then indicated that it wanted Lacey "to testify outside the presence of the jury as to her medical condition, why she can't travel, and why she was unable to provide documentation." (*Id.* at 121–22.)

Lacey, appearing by two-way video outside the presence of the jury, testified that (1) she felt "[s]harp pains in [her] chest and [her] left side went numb" while she was at work one day, (2) her supervisor called 911, (3) she was transported by ambulance to a hospital and was released later that same day, (4) she did not remember the name of the hospital, (5) she was not directly told not to travel by any doctor but was told to take it easy, (6) if she were forced to travel to Las Vegas her blood pressure would go up from stress, and (7) she went back to work three days after the heart attack. (*Id.* at 142–154.)

The trial court ruled that Lacey would be allowed to testify by two-way video:

> I think that a witness's testimony as to their own health condition is sufficient. Obviously, it's a balancing test the court has to weigh. The court has to assess the credibility of the witness and weigh the sufficiency of the evidence. But there's no per se rule saying that I

34

need documentary corroborating evidence here. So I'm challenged with the task of weighing the witness's testimony here and considering the relevance of - - we do have some documentary evidence of taking blood pressure medication, which I know she did take before the heart incident.

But it seems to me that there is at least probable cause and I'm convinced a preponderance of the evidence that the . . . witness's health would be unduly jeopardized if forced to travel. So I'm going to find here that there are strong public policy reasons to allow the witness to testify by videotape.

The public policy reasons, number one, we have to protect the health of a witness where there is probable cause to believe the witness's health would be unduly jeopardized if forced to travel. I also believe, more than that, that there's a public policy to present - - to allow the State to present material, relevant evidence through virtual face-to-face confrontation, which is what we have here under these circumstances, as I'm witnessing the presentation of the testimony now. We have virtual face-to-face confrontation, which should be allowed here where the State has undertaken reasonable efforts to secure the personal attendance of the witness. And through no fault of the State, there's been a determination that the witness is not going to be forcibly brought to the State.

So for those two public policy reasons, I think that there is justification for allowing the videotape testimony, particularly here where we have strong indicia of the reliability of the process and the testimony where we're going to have the witness under oath. We have virtual presence, her view is not blocked. We have clear audio and visual clarify [sic]. We have an ability to judge the demeanor of the witness through this process. She can be clearly heard and seen. So I think for all those reasons this is virtual presence and I find that there's no undue prejudice to the defendant and no violation of the Sixth Amendment confrontation clause.

(*Id.* at 157–59.) Chambers's trial counsel cross-examined Lacey. (ECF No. 27-38 at 169.)

### 2.    State court determination

In affirming Chambers's judgment of conviction, the Nevada Court of Appeals held that Chambers' confrontation rights were not violated and that Lacey's prior inconsistent statements were properly admitted into evidence:

Chambers contends that the district court violated his right to

35

confrontation by granting the State's motion to allow Cynthia Lacey to testify via audiovisual technology. Specifically, Chambers argues that (1) the State did not adequately establish that Lacey was too ill to travel; (2) Lacey's testimony via audiovisual technology violated his rights under the Confrontation Clause; and (3) he was prejudiced because Lacey responded "I don't remember" to all of the State's inquiries, which allowed the State to impeach her with prior inconsistent statements.

Whether a defendant's Confrontation Clause rights were violated is a question of law we review de novo. *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009). "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Although "the Confrontation Clause reflects a preference for face-to-face confrontation at trial," that preference "must occasionally give way to considerations of public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (emphasis and internal quotation marks omitted).

While *Craig* involved the use of one-way video technology, the Supreme Court of Nevada recently adopted the test articulated in Craig and applied it to two-way audiovisual technology. *Lipsitz v. State*, 135 Nev., Adv. Op. 17, 442 P.3d 138, 140 (2019). Adopting the *Craig* test, the supreme court articulated the audiovisual test for Nevada, namely that audiovisual testimony must (1) "further[ ]  the important public policy of protecting the victim's well-being," and (2) provide the indicia of reliability necessary to satisfy the elements of confrontation articulated in *Craig*—i.e., the witness was under oath, the defendant was able to cross-examine the witness, and the court and jury could observe the witness' credibility. *Id.* at 144.

In this case, the district court properly concluded that Lacey's sworn testimony was sufficient to satisfy the first prong of the test in *Lipsitz*, i.e., that her "health would be unduly jeopardized if forced to travel." *See id.* (discussing the important public interest of protecting a witness' well-being); *see also United States v. Benson*, 79 F. App'x 813, 821 (6th Cir. 2003) (affirming that the witness' testimony was sufficient to establish that she was too ill to travel). Thus, the district court correctly made a finding of necessity under the first prong of the *Lipsitz* test.

The record also demonstrates that the two-way audiovisual technology used in court satisfied the second prong of the *Lipsitz* test. Lacey was under oath, visible to the judge and the jury, and Chambers had an opportunity to cross-examine her at trial (which he declined to do).

> [FN3] Chambers' decision not to cross-examine Lacey at trial does not mean that he was deprived of his right to confrontation. *Pantano v. State*, 122 Nev. 782, 790, 138 P.3d 477, 482 (2006) ("[T]he Confrontation

Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (emphasis and internal quotation marks omitted).

As the district court's ruling met all of the criteria established in *Craig* and *Lipsitz*, we conclude that the district court's decision to permit Lacey to testify via audiovisual technology did not violate Chambers' rights under the Confrontation Clause.

Finally, Chambers was not prejudiced by the admission of Lacey's prior inconsistent statements. The record reveals that the State used extrinsic evidence to impeach Lacey's credibility after she responded "I don't remember" to questions regarding specific statements she had previously made to detectives during an investigative interview. The State then called Detective Raetz as a witness to testify about Lacey's prior statements. As part of its direct examination of Raetz, the State moved to publish relevant portions of the interview, which the district court allowed. Chambers did not object.

Under Nevada law, "when a trial witness fails, for whatever reason, to remember a previous statement made by that witness, the failure of recollection constitutes a denial of the prior statement that makes it a prior inconsistent statement pursuant to NRS 51.035(2)(a)." *Crowley v. State*, 120 Nev. 30, 35, 83 P.3d 282, 286 (2004). "The previous statement is not hearsay and may be admitted both substantively and for impeachment." *Id.* Generally, NRS 50.135(2) precludes the admission of "[e]xtrinsic evidence of a prior contradictory statement by a witness" unless "[t]he statement fulfills all the conditions required by subsection 3 of NRS 51.035; or . . . [t]he witness is afforded an opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate him thereon." NRS 50.135(2) (emphasis added).

Here, Lacey was asked about specific prior statements she made to detectives but failed to recall making them. Thus, pursuant to *Crowley*, Lacey's failure of recollection constituted a denial of her prior statement, making it a prior inconsistent statement under NRS 51.035(2)(a). *See also Richard v. State*, 134 Nev. Adv. Op. 64, 424 P.3d 626, 630 (2018) (explaining that a witness' "memory lapse was akin to a denial of his prior statement, and the State could properly present his prior inconsistent statement"). Moreover, the use of extrinsic evidence was proper because Lacey denied the prior statement and opposing counsel was afforded an opportunity to cross-examine her thereon. *See* NRS 50.135(2). Thus, Lacey's prior inconsistent statements were admissible pursuant to NRS 51.035(2)(a) and 50.135(2)(b), regardless of whether she testified via two-way audiovisual technology or from the witness stand inside the courtroom. In other words, the mode used to procure her testimony was irrelevant, since it had no bearing on admissibility. Because

37

Chambers' confrontation rights were not violated, and because Lacey's prior inconsistent statements were properly admitted into evidence, we conclude that the district court did not err.

(ECF No. 29-6 at 6–9.)

### 3. Standard

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "[T]he Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988). Regarding the former protection, as is relevant here, the Court has declared that, while "the Confrontation Clause reflects a *preference* for face-to-face confrontation," defendants do not have an "*absolute* right to a face-to-face meeting with witnesses against them at trial." *Maryland v. Craig*, 497 U.S. 836, 844, 849 (1990) (emphases in original). Thus, the Court held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where" (1) the "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." *Id.* at 850.

### 4. Analysis

The Nevada Court of Appeals reasonably determined that allowing Lacey to testify by two-way video did not violate Chambers's right to confrontation. First, applying the test outlined in *Craig*, the Nevada Court of Appeals reasonably found that allowing Lacey to testify by two-way video satisfied the public policy of protecting a witness's well-being. Here, Lacey testified that her health would be negatively impacted if forced to travel to Las Vegas because her blood pressure would go up from stress, which could result in significant affects to her health due to her recent heart attack. Although Chambers disputes the credibility of Lacey's testimony and medical condition, supplanting the trial court's reasonable

38

credibility determination is this regard is unwarranted.[6] *See Rice v. Collins,* 546 U.S. 333, 341–42 (2006) (that reasonable minds might disagree about a factual finding "does not suffice to supersede the trial court's credibility determination" on habeas review); *Hibbler v. Benedetti,* 693 F.3d 1140, 1148 (9th Cir. 2012) ("[W]e may not second-guess a state court's fact-finding process unless we determine that the state court was not merely wrong, but actually unreasonable." (internal quotations omitted)). Second, the Nevada Court of Appeals reasonably found that Lacey's testimony provided the indicia or reliability. Indeed, Lacey testified from the stability of an Arizona courtroom, Lacey was visible to everyone in the Las Vegas courtroom, everyone in the Las Vegas courtroom was visible to Lacey, Lacey was placed under oath, Lacey could be clearly heard, and Chambers cross-examined Lacey.

Because the Nevada Court of Appeals' determination was neither contrary to, nor an unreasonable application of, *Craig* and was not based on an unreasonable determination of the facts, Chambers is not entitled to federal habeas relief for ground 4.

### E.   Ground 5—preliminary hearing testimony at trial

In ground 5, Chambers alleges that he was denied the right to due process and a fair trial when the trial court allowed Graham's preliminary hearing testimony to be read into evidence at trial in violation of the Confrontation Clause and the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 18 at 25.)

#### 1.   Background information

---

[6] Even if Lacey's unavailability due to her medical condition was not sufficiently proven, the likely remedy would have been a continuance of the trial so that Lacey could appear in person. *See United States v. Carter,* 907 F.3d 1199, 1208 (9th Cir. 2018) ("The most obvious alternative would have been to continue the trial."). Accordingly, contrary to Chambers's contention, a finding that Lacey's medical condition was not sufficiently proven would not have necessarily meant that Lacey's testimony (and therefore her police interview) would have been altogether precluded.

The prosecution moved to admit Graham's preliminary hearing testimony at Chambers's trial. (ECF No. 27-25.) Within that motion, the prosecution explained the following:

> The State hopes to call Bridgette Graham to testify at trial and is currently making reasonable efforts to secure [her] presence at trial through all means available, including seeking a material witness warrant. The State has been able to ensure contact and appearance with the witness through prior settings and the only contact information she will provide is an email address. The State is seeking leave to use the preliminary hearing transcript, pursuant to *Hernandez v. State* because the witness gave an oral promise to appear and did not appear on the date and time of the subpoena. She contacted the State and said she was in Texas for a funeral and would return. When contact was made with her on the evening of the date of the subpoena[,] she told the State, via email, that she would not come to trial. When she was told a warrant would be sought[,] she claimed she would appear. The State will continue to make reasonable efforts to secure Bridgette Graham's appearance for trial and will supplement the record as needed to show said efforts.

(*Id.* at 4.) The trial court issued an order requiring Graham to either post $10,000 in bail or be committed to custody "to secure [her] attendance as a witness in the trial." (ECF No. 27-27 at 3.) The trial court then issued a warrant of arrest for Graham. (ECF No. 27-28.)

Later, on the fifth day of trial, the prosecution explained the following regarding Graham: "we have exhausted every legal process that we could to obtain her presence here at this point. . . . [A]t this point we are unable to get her here." (ECF No. 27-43 at 8.) Following argument by Chambers's trial counsel about the standard for unavailability, the trial court ruled as follows: "I'm gonna find that there's been reasonable efforts by the State here to try to get the witness here. I'm finding that she's unavailable under 51.055(1b)." (*Id.* at 13.)

Turning to Chambers's trial counsel's opportunity to cross examine Graham at the preliminary hearing, Chambers's trial counsel argued that Graham had a conviction "for [a misdemeanor] petit larceny, which is an impeachable offense under NRS 50.085," but because he "did not have that

information with [him] at the time of the preliminary hearing[,] . . . [he] did not impeach her on that."[7] (*Id.* at 15.) Chambers's trial counsel then explained that he did not have "access to the Justice Court portal" at the time to discover the misdemeanor conviction on his own and "that's something the State would not have disclosed prior to the preliminary hearing as it was a misdemeanor charge." (*Id.* at 18.) The prosecution rebutted that (1) Chambers's trial counsel could have sought Graham's misdemeanor conviction through other means, and (2) "the fact -that they won't be able to ask her if she's a dishonest person is not sufficient to show that . . . there wasn't a fair cross-examination particularly given the fact that the jury can be informed that she had [a] petit larceny [conviction]." (*Id.* at 19–20.)

The trial court granted the motion to allow Graham's preliminary hearing transcript to be read at the trial, explaining its ruling as follows: "I don't see that there's a violation of the 6th Amendment confrontation clause merely where defense counsel is not aware of a petit larceny misdemeanor and is deprived of a chance to then cross-examine the witness on that misdemeanor." (*Id.* at 20.)

### 2.   Standard

"[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). While "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (emphasis in original) (internal quotation marks omitted); *see also Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause's functional purpose i[s] ensuring a defendant an opportunity for cross-examination."). The Confrontation Clause bars "admission of testimonial

---

[7] Graham's larceny conviction took place before the Chambers's preliminary hearing. (ECF No. 27-43 at 15.)

statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). "[A] witness is not 'unavailable' . . . unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25 (1968); *see also Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir. 1994) ("The lengths to which a prosecutor must go to establish good faith is a question of reasonableness."). If "[a] Confrontation Clause violation" occurs, this court conducts a harmless error analysis. *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (holding that habeas relief is proper only if an error by the state courts "had substantial and injurious effect or influence in determining the jury's verdict")).

### 3.   State court determination

In affirming Chambers's judgment of conviction, the Nevada Court of Appeals held that the trial court did not err in admitting Graham's preliminary hearing testimony:

> Chambers contends that the district court erred by granting the State's motion to admit Bridgett Graham's preliminary hearing testimony. Specifically, Chambers contends that (1) the State failed to disclose Graham's prior conviction for petit larceny; (2) he was unable to impeach Graham with that undisclosed information at the preliminary hearing; and (3) as a result of this nondisclosure, he was denied the opportunity to effectively cross-examine Graham in violation of his right to confrontation.
>
> "[A] district court's decision to admit or exclude evidence [is reviewed] for an abuse of discretion." *Mclellan*, 124 Nev. at 267, 182 P.3d at 109. But whether a defendant's Confrontation Clause rights were violated is a question of law subject to de novo review. *Chavez*, 125 Nev. at 339, 213 P.3d at 484. The Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial *unless* he was unavailable to testify, and the defendant had . . . a *prior opportunity for cross-examination*." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004) (emphases added). For testimony from a preliminary hearing to be admitted at trial, the defendant (1) must have been represented by counsel at the

42

preliminary hearing, (2) must have had the opportunity to cross-examine the witness, and (3) the witness must be unavailable for the trial. *State v. Eighth Judicial Dist. Court (Baker)*, 134 Nev. 104, __, 412 P.3d 18, 22 (2018). Further, "the State must make reasonable efforts to procure a witness attendance at trial before that witness may be declared unavailable." *Hernandez v. State*, 124 Nev. 639, 645, 188 P.3d 1126, 1131 (2008), *abrogated on other grounds by Baker*, 134 Nev. at __, 412 P.3d at 22.

We agree that this case satisfies the elements set forth in *Hernandez* and *Baker*. Chambers was represented by counsel at the preliminary hearing where Graham testified. Further, Chambers cross-examined Graham at the preliminary hearing, and effectively challenged her credibility as Graham admitted during the hearing that she "was coming down" from methamphetamine where she witnessed the events of July 9, 2013.

> [FN4] Chambers also argues that the nondisclosure of Graham's prior petit larceny conviction rendered his cross-examination ineffective because he could not use it to impeach Graham. We do not find this argument persuasive. While Chambers correctly argues that NRS 50.085(3) may allow inquiry into specific instances of conduct where such conduct is relevant to truthfulness, it does not allow proof of such conduct by extrinsic evidence. Thus, even if Chambers had known about Graham's petit larceny conviction, the most he could have done with that information was ask Graham about the conduct, leaving him with her answer. It should also be noted that Chambers did not ask Graham if she had any prior convictions during his extensive questioning of her during the preliminary hearing. As discussed above, Graham's admission that she was "coming down" from methamphetamine at the time of the incident is arguably more damaging to her credibility than a misdemeanor conviction for petit larceny. Therefore, we conclude that there was no error.

The record also demonstrates that the State made reasonable efforts to procure Graham's attendance at trial. The State issued a subpoena (Graham failed to comply), followed up with an email (Graham responded she was "not coming"), and finally, obtained a warrant for Graham's arrest (the attempts to locate Graham were ultimately unsuccessful). After considering the State's efforts, the district court determined that it made reasonable efforts to procure Graham and that she was unavailable pursuant to NRS 51.055(1)(b).

> [FN5] NRS 51.055 states in pertinent part: "A declarant is 'unavailable as a witness' if the declarant is . . . [p]ersistent in refusing to testify despite an order of the judge to do so . . . ."

43

> Accordingly, we conclude that the district court correctly determined that the witness was unavailable and therefore did not err in admitting her preliminary hearing testimony.

(ECF No. 29-6 at 9–11.)

### 4.    Analysis

The Nevada Court of Appeals reasonably determined that the trial court did not err in admitting Graham's preliminary hearing testimony. Chambers does not dispute that Graham was unavailable to testify at his trial. His contention stems from his lack of cross-examination of Graham about her misdemeanor petit larceny conviction at the preliminary hearing, arguing that this amounted to a thwarted prior opportunity for cross-examination. The Nevada Court of Appeals reasonably rejected this argument.

The Court acknowledges that Chambers's inability to question Graham about her larceny conviction at the preliminary hearing—and, thus, inability to demonstrate to the jury that Graham is a dishonest person—impeded the effectiveness of his cross-examination. *See* Nev. Rev. Stat. § 50.085(3) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, . . . may, . . . if relevant to truthfulness, be inquired into on cross-examination of the witness."). However, in the context of a Confrontation Clause challenge, the Supreme Court has stated that, to determine whether a defendant received an adequate opportunity for effective cross-examination, the question to be answered is whether "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. Here, as the Nevada Court of Appeals reasonably pointed out, Chambers's trial counsel cross-examined Graham on the fact that she was "coming down" from being high on methamphetamine during the incident and sniffed methamphetamine after the incident. (ECF No. 27-1 at 82–83.) Although this information was not directly related to Graham's honesty, it was pertinent to

her overall character and credibility. As such, the introduction of this evidence refutes a finding that Chambers's trial counsel's proffered cross-examination about Graham's larceny conviction would have significantly changed the jury's impression of her given that the jury was already aware that she regularly consumed illegal substances.[8] *See Fowler v. Sacramento Cty. Sheriff's Dept.*, 421 F.3d 1027, 1038 (9th Cir. 2005) (explaining that the Court must consider "whether the proffered cross-examination sufficiently bore upon [the witness's] reliability or credibility such that a jury might reasonably have questioned it").

Accordingly, the Nevada Court of Appeals' denial of his ground was neither contrary to, nor an unreasonable application of, federal law and was not based on an unreasonable determination of the facts. Chambers is not entitled to federal habeas relief for ground 5.

### F. Ground 6—prosecutorial misconduct

In ground 6, Chambers alleges that he was denied the right to due process and a fair trial when the State committed prosecutorial misconduct during closing argument by commenting on Chambers' decision not to testify in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 18 at 28.)

#### 1. Background information

The prosecution made the following comments during closing argument:

> You recall what the defense said. He went over there, he didn't have a gun. He acted in self-defense. The dead guy attacked him, right? Mr. Bly had the gun. Ladies and gentlemen, this is not a case

---

[8] Even if the Court were to find that the trial court violated Chambers's right to confront Graham, this violation would be "subject to *Chapman* harmless-error analysis." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). That analysis asks "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* The most damaging portion of Graham's preliminary hearing testimony was the fact that Chambers had told her that he had tried to rob Papoutsis; however, Lacey testified that Chambers told her that he was planning on robbing Papoutsis, making Graham's testimony relatively harmless.

45

of self-defense. There's an instruction that tells you if there is some evidence of self-defense, the State must prove it. And I totally accept that responsibility. However, when there is no evidence of self-defense, all that there is is the defense opening statement telling you he acted in self-defense. There's no evidence of self-defense. Therefore, the State is not obligated to disprove it in any shape or form. This is not a case of self-defense.

Flight instruction, that's going to be number 47. It tells you that basically flight, you leave after a crime. It's the idea of deliberately going away with a consciousness of guilty. And if there's evidence, if you believe there's evidence that the defendant fled from the crime, you can use that evidence for this reason. It's the idea, again, of going away with a consciousness of guilt and for the purpose of avoiding apprehension or prosecution.

So, let's consider what did he do after the crime? What did he do? What didn't he do? He left, right? He didn't stay and talk to police, anything like that. He didn't tell his story, right?

(ECF No. 27-44 at 30–31.) Chambers's trial counsel "object[ed] as to that last comment." (*Id.* at 31.) The trial court sustained the objection and stated, "[t]he jury will disregard the last remark of the prosecutor regarding telling his story. Please strike that from your minds and don't consider it." (*Id.* at 31–32.) The prosecution then continued:

He left the scene. He didn't call 9-1-1. He never contacted police. He ditched the phone. We know that, right? The phone was found on the steps by Detective Merrick. He distanced himself from the car. And what I mean by that is he didn't return the car. He left the car with Erika to take back for him.

He got the call logs deleted, right? Remember, he called Cynthia and got those call logs deleted. He never went home. The gun's not with him when he's found. You heard the testimony from the officers, the detectives, that they searched high and low for that gun in the area where they knew he was. Helicopters, canines, that's what the detective testified to, right? No gun was found. He missed his meeting. Remember, the detective said they hoped to find him at a two p.m. meeting, but they were unsuccessful.

(*Id.* at 32.)

Later, outside the presence of the jury, the prosecutor explained his comment about Chambers not telling his story: "That is not commenting on silence. Commenting on silence is once someone is arrest, their indication of their

rights. The fact that he did not stay and did not give his version of events was not a violation." (*Id.* at 59.) Chambers's trial counsel moved for a mistrial based on the comment, arguing that the jury could have taken the comment as Chambers's "refus[al] to speak to the police at the time, which is a violation of his Fifth Amendment right, just like it could be a comment on his failure to testify here in court." (*Id.* at 59–60.) The trial court indicated that "it was just a little bit unclear to me in the context whether that was referring to the silence at the time or the silence now," explaining that "[i]f he's referring to silence at the time, such as he didn't call 9-1-1, that's one thing" but "[i]f he intended to convey to the jury that we haven't heard from him, that's an entirely different thing." (*Id.*) The trial court then indicated that it was "going to listen to JAVS and refresh [its] memory as to the comments that were made and the context in which they were made." (*Id.* at 60–61.)

The following day, the trial court explained the following:

> I did go back and listen to JAVS about the comment [the prosecution] made with reference to the defendant remaining silent after he -- the scene of the crime. After having listened to it, I listened to it three different times. I think a reasonable person would understand the context was in connection with him being silent right after the crime and not being silent here at trial. Even though I sustained the State's or sustained defendant's objection and cautioned the jury, I was probably overly cautious in doing that. It probably could have gone a different way with another judge.

(ECF No. 27-50 at 4–5.)

### 2.  Standard

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the State."). A prosecutor's comments on a defendant's failure to testify violate the self-incrimination clause.

47

*Griffin v. California*, 380 U.S. 609, 615 (1965); *see also United States v. Robinson*, 485 U.S. 25, 32 (1988) ("Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated."). While the prosecution violates *Griffin* when it "direct[ly] comment[s] about the defendant's failure to testify," the prosecution only violates *Griffin* when it "indirect[ly] comment[s about the defendant's failure to testify] . . . if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (internal quotation marks omitted). "Reversal is warranted only where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." *Id.* (internal quotation marks omitted); *see also Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) ("[C]ourts will not reverse when the prosecutorial comment is a single, isolated incident, does not stress an inference of guilt from silence as a basis of conviction, and is followed by curative instructions.").

### 3.    State court determination

In affirming Chambers's judgment of conviction, the Nevada Court of Appeals held that the prosecution's comment did not regard Chambers' silence at trial, but rather, his flight from the crime scene:

> Chambers contends that the State improperly commented on his right to remain silent during closing argument, and therefore, a mistrial should have been granted. Specifically, the State, when discussing Chambers' post-crime conduct during closing argument, said, "He didn't stay and talk to the police . . . . He didn't tell his story, right?" Below, Chambers objected and moved for a mistrial. The district court denied Chambers' motion for a mistrial, and instead admonished the jury to disregard the remark made by the prosecutor.
> "Denial of a motion for mistrial is within the district court's sound discretion, and [the reviewing] court will not overturn a denial

absent a clear showing of abuse." *Randolph v. State*, 117 Nev. 970, 981, 36 P.3d 424, 431 (2001). Further, when reviewing claims of prosecutorial misconduct, this court first determines whether the prosecutor's conduct was improper and, if so, whether the conduct warrants reversal. *Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008).

After a review of the record, we conclude that the State did not comment on Chambers' silence at trial, but rather, his flight from the crime scene. During closing, the State argued in pertinent part:

Flight instruction, that's going to be [jury instruction] number 47. It tells you that basically flight, you leave after a crime. It's the idea of deliberately going away with a consciousness of guilt[ ]. And if there's evidence, if you believe there's evidence that the defendant fled from the crime, you can use that evidence for this reason.

. . . .

So, let's consider what did [Chambers] do after the crime? What did he do? What didn't he do? *He left, right?* He didn't stay and talk to police, anything like that. *He didn't tell his story, right?*

(Emphases added.)

We recognize "that the prosecution is forbidden at trial to comment upon an accused's election to remain silent following his arrest and after he has been advised of his rights." *Gaxiola v. State*, 121 Nev. 638, 655, 119 P.3d 1225, 1237 (2005) (emphasis added) (internal quotation marks omitted). There is, however, no such prohibition regarding comments related to a defendant's post-crime conduct and flight. *See, e.g., Santillanes v. State*, 104 Nev. 699, 701, 765 P.2d 1147, 1148 (1988) (holding that there is no prosecutorial misconduct where the prosecutor commented on the defendant's failure to attend a scheduled meeting with police and his subsequent flight to Mexico, as the jury could infer consciousness of guilt). Therefore, in this context, it is not improper for the prosecution to comment on a defendant's pre-arrest conduct, nor has Chambers cited to any case that stands for such a proposition. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) ("It is appellant's responsibility to present relevant authority and cogent argument; issues not so presented need not be addressed by this court."). Accordingly, we conclude that there was no prosecutorial misconduct, and the district court did not abuse its discretion in denying the motion for a mistrial.

(ECF No. 29-6 at 12–13.)

### 4.    Analysis

The Nevada Court of Appeals reasonably determined that the prosecution's

comment regarded Chambers's post-crime conduct rather than his silence at trial. The prosecution discussed the flight instruction and then immediately posed the following questions to the jury: "So, let's consider what did he do after the crime? What did he do? What didn't he do? He left, right? He didn't stay and talk to police, anything like that. He didn't tell his story, right?" (ECF No. 27-44 at 31.) These questions plainly were about Chambers's actions after the crime and the fact that he fled the scene rather than staying to explain to the police that he had allegedly acted in self-defense. Therefore, viewed in context, the prosecutor's comment did not directly or indirectly touch on Chambers's failure to testify in violation of *Griffin*. *See Boyde v. California*, 494 U.S. 370, 385 (1990) ("[T]he arguments of counsel . . . must be judged in the context in which they are made."). Accordingly, the Nevada Court of Appeals' determination that the prosecutor's comment did not amount to misconduct was neither contrary to, nor an unreasonable application of, federal law and was not based on an unreasonable determination of the facts. Chambers is not entitled to federal habeas relief for ground 6.

### G.    Ground 7—cumulative errors

In ground 7, Chambers alleges that the cumulative effect of the trial court errors denied him the right to due process and a fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.[9] (ECF No. 18 at 32.)

In affirming Chambers's judgment of conviction, the Nevada Court of Appeals held: "Because we conclude that there are no errors to cumulate, we also conclude that there is no cumulative error warranting reversal. *Morgan v. State*, 134 Nev. 200, ___ n.1, 416 P.3d 212, 217 n.1 (2018)." (ECF No. 29-6 at 18 n.9).

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of

---

[9] This ground was previously dismissed to the extent it included trial counsel errors. (ECF No. 43.)

multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Having found no errors in grounds 3, 4, 5, or 6, the Nevada Court of Appeals reasonably determined that there are no errors to cumulate. As such, because the Nevada Court of Appeals' determination was neither contrary to, nor an unreasonable application of, federal law and was not based on an unreasonable determination of the facts, Chambers is not entitled to federal habeas relief for ground 7.

## IV.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Chambers. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability. Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a Certificate of Appealability is appropriate only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.* Applying these standards, this Court finds that a Certificate of Appealability is unwarranted.

## V.   CONCLUSION

It is therefore ordered that the Second-Amended Petition for Writ of Habeas

51

Corpus under 28 U.S.C. § 2254 [ECF No. 18] is denied.

It is further ordered that the motion to seal [ECF No. 72] is granted. Exhibit 146 (ECF No. 73-1) is considered properly filed under seal.

It is further ordered that a Certificate of Appealability is denied.

It is further kindly ordered that the Clerk of the Court enter judgment and close this case.

DATED THIS 17th day of March 2026.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE